## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| BARRY WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:19-CV-41 RLW |
| | ) |
| DR. RUANNE STAMPS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This prisoner civil rights matter under 42 U.S.C. § 1983 is before the Court on Defendant Dr. Ruanne Stamps' Motion for Summary Judgment (ECF No. 17).[1] Plaintiff Barry White, a self-represented prisoner, has not filed a response to the Motion for Summary Judgment and the time to do so passed in May 2020. On July 30, 2020, the Court issued an Order to Show Cause (ECF 21) that ordered Plaintiff to respond to Defendant's Motion for Summary Judgment by August 31, 2020. The Order specifically cautioned Plaintiff that his failure to comply timely and fully with the Court's Order could result in the Court without further notice (1) dismissing Plaintiff's case in its entirety without prejudice for failure to prosecute his case and failure to comply with the Court's order, or (2) ruling on the Motion for Summary Judgment as unopposed. The Court now addresses Defendant's Motion as unopposed.

## Background

Plaintiff alleges Dr. Stamps was deliberately indifferent to his serious medical needs at Moberly Correctional Center ("MCC") in violation of the Eighth Amendment. (Complaint, ECF No. 1 at 6-7.) Plaintiff claims he is suffering pain in his urinary tract and that Dr. Stamps is

---

[1] The Motion is filed by Defendant Stamps in her individual capacity. Plaintiff's claims against Defendant Stamps in her official capacity were dismissed on July 19, 2019, as legally frivolous or for failure to state a claim upon which relief could be granted, or both. (ECF Nos. 7, 8.)

denying him treatment for the pain and for prostate cancer. (Id. at 6.) He contends she denied him a medication called UriVArx® to help with urinary incontinence and surgery for an artificial sphincter to "follow up on prostate cancer" and offer pain relief. (Id. at 6-7.) Plaintiff seeks compensatory and punitive damages as well as injunctive relief against Dr. Stamps.[2] (Id. at 4-5.)

**Summary Judgment Standard**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. "The nonmoving party may not rely on allegations or denials," but rather "must substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor on more than mere speculation or conjecture." Carter v. Pulaski Cnty.

---

[2]Plaintiff's claim for injunctive relief seeks to prevent Dr. Stamps from treating him. (ECF No. 1 at 5.) This claim is moot as Dr. Stamps no longer works at MCC where Plaintiff is incarcerated and is not involved with his care. (Stamps Decl., ECF No. 19-1 ¶ 2.) See Randolph v. Rodgers, 253 F.3d 342, 345 (8th Cir. 2001) (claims for prospective injunctive relief were moot when plaintiff and defendants were at different facilities); Beaulieu v. Ludeman, 690 F.3d 1017, 1024 (8th Cir. 2012) ("In general, a pending claim for injunctive relief becomes moot when the challenged conduct ceases and there is no reasonable expectation that the wrong will be repeated.") (quoted case omitted).

Special Sch. Dist., 956 F.3d 1055, 1059 (8th Cir. 2020) (quoting Ball v. City of Lincoln, Neb., 870 F.3d 722, 727 (8th Cir. 2017) (cleaned up)).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.

**Findings of Fact**

I.

As a threshold matter, Plaintiff failed to respond to Defendant's Statement of Uncontroverted Material Facts in Support of her Motion for Summary Judgment ("SOF") (ECF No. 19). The SOF is supported by citations to Defendant Stamps' Declaration (ECF No. 19-1) and to Plaintiff's extensive institutional medical records (ECF No. 19-2), which were kept by MCC in the ordinary course of business.[3] Under the Court's Local Rule 4.01(E), where Plaintiff failed to submit a statement of material facts as to which he contends a genuine issue exists, he is deemed to have admitted all facts which were not specifically controverted. See Roe v. St. Louis Univ., 746 F.3d 874, 881 (8th Cir. 2014) (If the opposing party does not raise objections to a movant's statement of facts as required by Local Rule 4.01(E), "a district court will not abuse its discretion by admitting the movant's facts."). Plaintiff's "status as a pro se litigant [does] not excuse [him] from following the local rules." Bunch v. Univ. of Ark. Bd. of Trustees, 863 F.3d 1062, 1067 (8th Cir. 2017).

That said, the Court treats Plaintiff's verified Complaint as the equivalent of an affidavit for summary judgment purposes and accepts the facts set forth therein as true. See Williams v. York, 891 F.3d 701, 703 n.2 (8th Cir. 2018) (citations omitted). "Although a party may not

---

[3]Defendant submits 811 pages of Plaintiff's medical records.

generally rest on [his] pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion." Roberson v. Hayti Police Dep't, 241 F.3d 992, 994-95 (8th Cir. 2001). Where the verified allegations of Plaintiff's Complaint conflict with the Defendant's SOF, the Court examines each fact individually to determine if a genuine dispute of fact exists.

II.

1. Plaintiff Barry White was incarcerated by the Missouri Department of Corrections at Moberly Correctional Center ("MCC") at all times relevant to this lawsuit. (See ECF No. 1.)

2. Dr. Ruanne Stamps is a medical doctor licensed by the State of Missouri since 1992. (Def.'s Ex. A, Decl. of Dr. Ruanne Stamps, ECF No. 19-1, ¶ 2.)

3. Dr. Stamps is currently the Medical Director at Tipton Correctional Center ("TCC"), and was formerly the Medical Director at MCC, where she provided care to Plaintiff. (Id.)

4. Plaintiff's medical records show that prior to his incarceration he had a radical prostatectomy in 2007 to remove his prostate as part of treatment for prostate cancer. (Id. ¶¶ 5-6.) Plaintiff did not complete radiation treatment after the surgery, but chose to monitor his prostate specific antigen (PSA) level instead. (Id. ¶ 6.)

5. In 2008, Plaintiff had surgery for erectile dysfunction in which an inflatable penile prosthesis ("IPP") was surgically placed. (Id. ¶ 5.)

6. On January 13, 2016, Plaintiff reported to Dr. Danny Long Huynh, urologist at the Veterans Administration Urology Clinic, that his IPP was malfunctioning and he wanted surgery for stress urinary incontinence because a sling placed in 2010 for incontinence had failed. (Id. ¶ 7.)

7. Dr. Huynh noted they discussed an artificial urinary sphincter ("AUS") in the past but Plaintiff was thought to be a poor candidate because he was only using 1-2 pads per day and was an alcoholic. (Id.) However, he had reportedly been sober for five years and reported currently using three pads per day. (Id.)

8. Dr. Huynh noted Plaintiff had a very small rise in PSA, a possible indicator of prostate cancer recurrence, which would be monitored. (Id. ¶ 8.) He also scheduled Plaintiff for an IPP replacement and explained the IPP and an AUS procedure would be staged 3-4 months apart to reduce the risk of infection and erosion. (Id.)

9. An AUS is a device made of silicone rubber that is used to treat urinary incontinence. (Id. ¶ 9.) It has an inflatable cuff that fits around the urethra close to the point where it joins the bladder. (Id.) This keeps the urinary sphincter closed until the patient is ready to urinate. (Id.) To urinate, the patient must press a valve implanted under the skin that causes the ring to deflate and allows urine to flow from the bladder. (Id.) The procedure is recommended for some men who have urine leakage that can occur after prostate surgery. (Id.) Complications with AUS surgery include infection in the artificial sphincter, erosion of the skin of the urethra, and failure of the artificial sphincter to work. (Id.)

10. On March 7, 2016, Plaintiff had surgery to replace the IPP. (Id. ¶ 10.)

11. On June 24, 2016, Plaintiff saw Dr. Daniel Seth Hoyt at the VA Urology Clinic. (Id. ¶ 11.) Plaintiff's IPP was working very well since the replacement and he was still interested in the AUS procedure. (Id.) Dr. Hoyt noted that Plaintiff's PSA was 0.3 when it had been 0.2 in October 2015, which confirmed a biochemical recurrence of prostate cancer. (Id.) Dr. Hoyt recommended radiation treatment and placed a consult with radiation oncology. (Id.) Dr. Hoyt noted they would hold off on AUS until at least six months after completing radiation. (Id.)

hyperplasia ("BPH") such as difficulty in beginning the flow of urine, weak stream, and the need to urinate often or urgently. (Id.)

17. On January 31, 2017, labs showed Plaintiff's PSA was down to 0.01. (Id. ¶ 17.)

18. On April 27, 2017, Plaintiff transferred from FRDC to MCC. (Id. ¶ 18.)

19. On May 2, 2017, Plaintiff saw Dr. Michael Hakala for chronic care. (Id. ¶ 18.) He saw nurses in sick call for complaints of frequent urination on May 23, May 30, June 5, June 8, June 18, and June 18, 2017, and was instructed to stop drinking fluids after 4:00 p.m. and was educated about aging, urinary frequency, and incontinence. (Id. ¶ 19.)

20. Dr. Stamps saw Plaintiff on July 17, 2017 for multiple chronic issues. (Id. ¶ 20.) Plaintiff reported incontinence and frequent urination. (Id.) Dr. Stamps noted he was diagnosed with prostate cancer in 2007 and had a radical prostatectomy followed by radiation treatment in 2016 for increasing PSA. (Id.) She ordered a current PSA and repeat every 6 months. (Id.) Dr. Stamps discontinued Flomax because Plaintiff did not have bladder outlet obstruction as his prostate had been removed. (Id.) She continued the Depends and approved a lay-in for a cell close to the bathroom. (Id.) On July 19, 2017, Plaintiff's PSA was < 0.01. (Id.)

21. There are multiple types of urinary incontinence. (Id. ¶ 21.) With stress incontinence, urine leaks when pressure is placed on the bladder by coughing, sneezing, or some other physical activity. (Id.) Urge incontinence occurs when there is a sudden, intense urge to urinate followed by an involuntary loss of urine. (Id.) This can be caused by another condition such as diabetes, a neurological disorder, or an infection. (Id.) With overflow incontinence, the patient has frequent or constant dribbling of urine because the bladder is not emptying completely. (Id.) Some patients experience a combination of these. (Id.) In men, stress incontinence or urge incontinence can be associated with untreated prostate cancer. (Id.) However, incontinence is more often a side effect of treatments for prostate cancer. (Id.)

22. Treatment for urinary incontinence depends on the type of incontinence, the severity, and the underlying cause. (Id. ¶ 22.) A combination of treatments might be needed. (Id.) Treatment options usually begin with the least invasive treatments, such as bladder training or fluid and diet management. (Id.) In addition, Kegel exercises are recommended to strengthen the pelvic muscles that control urination. (Id.) Medications are also commonly prescribed for incontinence. (Id.) Anticholinergics such as oxybutynin can lessen an overactive bladder and help with urge incontinence. (Id.) Alpha blockers such as Flomax are used to help treat urge or overflow incontinence. (Id.) They work by relaxing the bladder neck muscles and muscle fibers in the prostate to make it easier to fully empty the bladder. (Id.) If other treatments have failed, surgical procedures such as sling procedures, bladder neck suspension, or AUS might be recommended. (Id.) If incontinence continues, the patient may continue to wear absorbent pads or underwear or use catheters. (Id.)

23. Dr. Stamps saw Plaintiff again on November 30, 2017 to assess medication renewal and his request for surgery. (Id. ¶ 23.) Plaintiff was a 64-year-old smoker who reported he had a bladder sling and wanted surgery again for incontinence. (Id.) He stated he was supposed to have surgery when he got locked up again. (Id.) Plaintiff reported he used two diapers per day and one at night and a review of his 2016 VA records showed this was unchanged. (Id.) Dr. Stamps requested a repeat chest CT, resumed Flomax, and instructed him to submit a Health Services Request ("HSR") in one month if he needed the dose increased. (Id.) She resumed Flomax because Plaintiff thought it previously had helped. (Id.)

24. On December 21, 2017, Plaintiff saw Nurse Andrea Crader for urinary problems. (Id. ¶ 24.) He reported going to the bathroom multiple times per day and over 30 times the previous night. (Id.) Nurse Crader referred Plaintiff to a practitioner and performed a urine dip, which was normal. (Id.)

8

25. On January 10, 2018, Plaintiff's PSA was again < 0.01. (Id. ¶ 25.)

26. On January 17, 2018, Dr. Stamps saw Plaintiff for his chronic care issues. (Id. ¶ 26.) He complained of urinary incontinence but stated that Flomax helped but he still wanted AUS surgery. (Id.) He was not currently undergoing cancer treatment. (Id.) Plaintiff declined a digital rectal exam and Dr. Stamps noted his most recent PSA was < 0.01. (Id.)

27. On March 16, 2018, Plaintiff saw Nurse Burgett for urinary problems. (Id. ¶ 27.) He reported using Flomax but stated he heard of a new medication called UriVArx® and wanted to discuss the possibility of using that medication so he would not have to use Depends at night. (Id.) He reported Flomax was not working. (Id.)

28. Dr. Stamps saw Plaintiff on March 26, 2018 to discuss his request for UriVArx®. (Id. ¶ 28.) Dr. Stamps noted Plaintiff was a 65-year-old with history of prostatectomy and radiation with continued incontinence and complaining of nocturia up to 27 times per night. (Id.) She increased his dosage of Flomax to two tabs, instructed him on the use of Kegel exercises to control his bladder, and instructed him to submit an HSR in one month if no improvement. (Id.)

29. Dr. Stamps did not prescribe UriVArx® for Plaintiff because it is not FDA-approved to treat urinary incontinence, and is not proven or medically approved to treat urinary incontinence. (Id. ¶ 29.) According to its website, UriVArx® is a supplement made from a blend of Linder extract, Horsetail (aerial parts) extract, and three-leaf caper (bark) extract. (https://www.urivarx.com/what-is-urivarx/ (last visited Nov. 2, 2020).) Additional ingredients are vegetable capsule (HPMC, water), rice flour, and silica. (Id.) The website notes that UriVArx® "is not intended to treat unhealthy people or people with urinary issues. Like a vitamin, it is intended to support and compliment a healthy system and diet." (Id.) It is not "intended to diagnose, treat, cure or prevent any disease." (Id.)

9

30. On April 12, 2018, Plaintiff submitted an HSR stating he needed to see a doctor other than Dr. Stamps and wanted to start taking UriVArx®. (Id. ¶ 30.) He saw Nurse Maurita Jenness and had a newspaper article with an advertisement for UriVArx® to help excess voiding at night. (Id.) Flomax was increased to two tabs per day and Plaintiff stated he thought it was helping. (Id.) He reported he got up 29 times at night. (Id.)

31. Dr. Stamps saw Plaintiff again on July 16, 2018 for his chronic care issues. (Id. ¶ 31.) Plaintiff reported blood on his sheets once that he thought was from his penis, but he had no lesions, no blood in urine, and no recurrence. (Id.) He reported Flomax was helping and he had less nocturia. (Id.) A urine dip was negative and his PSA was < 0.01. (Id.) Dr. Stamps renewed Flomax for six months and continued the Depends as needed. (Id.)

32. On January 8, 2019, Plaintiff's PSA was still < 0.01. (Id. ¶ 32.)

33. On January 21, 2019, Dr. Stamps saw Plaintiff for his chronic care issues. (Id. ¶ 33.) Plaintiff was a 66-year-old with continued incontinence but thought Flomax helped and wanted to continue it. (Id.)[4] He was still using Depends as needed. (Id.) Plaintiff's PSA was unchanged at < 0.01. (Id.) Dr. Stamps renewed the Flomax for 180 days. (Id.)

34. Dr. Stamps saw Plaintiff again on April 11, 2019 for continued complaints of urinary issues, especially dribbling. (Id. ¶ 35.) He reported he had to wear two diapers per day. (Id.) Dr. Stamps assessed urinary incontinence, likely mixed. (Id.) She prescribed a trial of oxybutynin (Ditropan) 10 mg tabs for 90 days and noted that a post-void residual ("PVR") needed to be done. (Id.) Dr. Stamps instructed Plaintiff to follow up with nursing in one month to assess his response to the medication for a possible dosage increase. (Id.)

35. On May 3, 2019, Plaintiff saw Nurse Heather McCain for a PVR. (Id. ¶ 37.) A PVR urine test measures the amount of urine left in the bladder after urination and is used to assess

_____

[4]Dr. Stamps' Declaration incorrectly states that Plaintiff was 68 years old on January 21, 2019.

10

incontinence. (Id.) The test is usually performed by a nurse inserting a catheter into the urethra and the bladder to drain any urine that remains after the patient urinates. (Id.) In adults, less than 50 mL urine is adequate bladder emptying, whereas over 200 mL urine indicates inadequate emptying. (Id.) Plaintiff's result showed 0 cc urine remaining in the bladder after voiding. (Id.) Plaintiff tolerated the procedure with no complaints. (Id.) This test indicated to Dr. Stamps that Plaintiff did not have overflow incontinence, meaning he likely had a combination of urge and stress incontinence.

36. On May 22, 2019, Dr. Stamps saw Plaintiff to follow up from an abdominal CT. (Id. ¶ 39.) Plaintiff reported no GI upset or pain after eating but increased dribbling/incontinence. (Id.) He stated he planned to decrease sodas, and Dr. Stamps agreed with this plan. (Id.)

37. On July 12, 2019, Plaintiff's PSA was < 0.02. (Id. ¶ 40.)

38. Dr. Stamps saw Plaintiff again on August 29, 2019 for his chronic care issues. (Id. ¶ 41.) He reported his urinary symptoms were improved since decreasing sodas/fluids. (Id.) Plaintiff was taking both oxybutynin and Flomax but reported he had issues at night and if he laughed. (Id.) His most recent PSA was < 0.02 and Dr. Stamps renewed the oxybutynin and Flomax for six months. (Id.)

39. On January 8, 2020, Plaintiff's PSA was again < 0.02. (Id. ¶ 42.)

40. Uncommonly (in 5 to 15 percent of patients), patients can develop a slowly rising PSA that does not represent prostate cancer recurrence. (Id. ¶ 42.) This is due to a small amount of residual noncancerous prostate tissue remaining in situ after surgery and slowly growing to produce a small quantity of PSA that becomes detectable in the blood. (Id.) However, a PSA level of 0.4 ng/mL after successful radical prostatectomy is highly concerning for recurrent disease; patients with a persistent or rising PSA at this level should be considered for adjunctive therapy, generally radiation therapy to the prostatic bed. (Id.) According to the revised Phoenix

11

criteria, a PSA rise of 2 ng/mL or more above the nadir PSA is considered the standard definition for biochemical failure after external beam RT, regardless of whether or not a patient receives androgen deprivation therapy. (Id.) Plaintiff's PSA has remained < 0.2 so continued monitoring is warranted. (Id.)

41. On January 28, 2020, Dr. Stamps renewed all of Plaintiff's chronic care medications, including Flomax and oxybutynin. (Id. ¶ 43.)

42. Dr. Stamps never disregarded or ignored Plaintiff's medical needs. (Id. ¶ 45.)

43. Dr. Stamps did not prescribe UriVArx® because it is not FDA-approved to treat urinary incontinence. (Id. ¶ 45.)

44. Dr. Stamps did not request the AUS procedure because Plaintiff has reported improvement with Flomax and oxybutynin, and she does not believe the possible benefits of the surgical procedure outweigh the risks. (Id. ¶ 45.)

45. At this point, an AUS procedure is considered elective, and Plaintiff's incontinence can be managed with medication, fluid restrictions, continued Kegel exercises, and use of Depends. (Id. ¶ 45.)

46. Plaintiff's prostate cancer has not been ignored. (Id. ¶ 45.) After he completed radiation treatment prior to his incarceration, there has been no indication that the cancer has returned. (Id.) Plaintiff does not need any cancer treatment at this time. (Id.) His PSA has remained below 0.02 and it is regularly monitored to evaluate for any recurrence. (Id.)

**Discussion**

A. Legal Standard

The plaintiff in a Section 1983 action must show that a defendant deprived him of a constitutional right while acting under color of state law. Roudybush v. Zabel, 813 F.2d 173, 176 (8th Cir. 1987) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 150 (1970)). "A

12

defendant will not be held liable under 42 U.S.C. § 1983 unless [s]he was personally involved in causing the deprivation of a constitutional right." Triplett v. Azordegan, 570 F.2d 819, 823 (8th Cir. 1978).

A prisoner's Eighth Amendment rights are violated if prison officials exhibit deliberate indifference to the prisoner's serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976); Farmer v. Brennan, 511 U.S. 825 (1994). A claim of deliberate indifference involves both an objective and subjective standard. Wilson v. Seiter, 501 U.S. 294, 298 (1991). The defendant's conduct must objectively rise to the level of a constitutional violation, id., by depriving the plaintiff of the "minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834.

Under the subjective standard, an official is deliberately indifferent if she knows of and disregards an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference. Farmer, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id. at 838. Thus, the Supreme Court has likened deliberate indifference to a criminal recklessness standard. Id. at 839; Allard v. Baldwin, 779 F.3d 768, 771-72 (8th Cir. 2015). "This onerous standard requires a showing 'more than negligence, more even than gross negligence,' Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008), but less than 'purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate,' Schaub v. VonWald, 638 F.3d 905, 914-15 (8th Cir. 2011)." Thompson v. King, 730 F.3d 742, 747 (8th Cir. 2013).

13

Action or inaction that constitutes medical malpractice, inadvertent failure to provide adequate medical care, or simple negligence does not amount to deliberate indifference or a constitutional violation. See Dulany v. Carnahan, 132 F.3d 1234, 1243 (8th Cir. 1997). "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Id. at 1239. And, "showing that another physician might have ordered different tests and treatment does not show deliberate indifference." Id. at 1242. "[T]he question whether ... additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." Estelle, 429 U.S. at 107. It is well established that an inmate's "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Phillips v. Jasper Cnty. Jail, 437 F.3d 791, 795 (8th Cir. 2006) (quoted case omitted).[5]

## B. Defendant was not Deliberately Indifferent to Plaintiff's Serious Medical Needs

As an initial matter, Dr. Stamps does not dispute for purposes of summary judgment, and the Court finds, that Plaintiff's incontinence and history of prostate cancer are objectively serious medical needs. However, Dr. Stamps is entitled to summary judgment because she was not deliberately indifferent to those needs.

The undisputed evidence shows that Dr. Stamps provided constitutionally adequate medical care for Plaintiff. Plaintiff was seen on a regular basis in the chronic care clinic by Dr. Stamps and other MDOC health care providers, as documented in his extensive medical records. Dr. Stamps provided Plaintiff with a lay-in to be housed in a cell close to the bathroom, Depends,

---

[5]Defendant's Memorandum in Support quotes the Eighth Circuit's decision in Schaub v. VonWald, 638 F.3d 905, 935 (8th Cir. 2011) ("Under the Eighth Amendment, 'inmates are only entitled to 'adequate medical care,' not the best care possible.'") (ECF No.18 at 11, 13), without an accompanying parenthetical explanation that the quoted language was from a dissenting opinion. A parenthetical explanation should have been provided to add information indicating the weight of the cited authority.

Flomax and oxybutynin, requested CT scans, ordered labs to monitor PSA levels, ensured that a PVR was completed, and educated him on incontinence, fluid intake, and Kegel exercises.

Although Plaintiff wanted Dr. Stamps to prescribe UriVArx®, the evidence is that she did not prescribe it because it is not FDA-approved or proven to treat urinary incontinence. (Findings of Fact, *supra*, ¶¶ 29, 43.) Instead, she prescribed medications such as Flomax and oxybutynin, which work in different ways to treat symptoms of incontinence. (Id. ¶ 22.) Plaintiff reported multiple times that these medications were providing some relief for his symptoms and complaints. (Id. ¶¶ 23, 26, 30-31.) To the extent Plaintiff disagrees with his course of treatment and Dr. Stamps' medical judgment, he fails to show an issue of material fact as to deliberate indifference. See Allard, 779 F.3d at 772-73 ("Although [Plaintiff] reported his displeasure with the ordered treatments, a healthcare provider need not accept as true medical judgments offered by their patients but must make treatments decisions on the basis of many factors, only one of which is patient's input."). Assuming for purposes of argument that there was any evidence Dr. Stamps was negligent in her treatment decisions, Plaintiff's deliberate indifference claim still fails as a matter of law. See Dulany, 132 F.3d at 1239, 1243.

Plaintiff also alleges Dr. Stamps was deliberately indifferent for not providing him the AUS surgical procedure. The evidence is that Dr. Stamps did not request the AUS procedure because Plaintiff reported improvement with Flomax and oxybutynin, and she does not believe the possible benefits of the surgical procedure outweigh the risks. (Findings of Fact ¶ 44.) Further, an AUS procedure is considered elective, and Plaintiff's incontinence can be managed conservatively with medication, fluid restrictions, continued Kegel exercises, and use of Depends. (Id. ¶ 45.) As stated above, to the extent Plaintiff disagrees with his course of treatment or contends that Dr. Stamps committed medical malpractice or was negligent in not referring him for an AUS, those claims fail. See Dulany, 132 F.3d at 1239, 1243; Allard, 779

F.3d at 772-73. Although Plaintiff wants an AUS, he is not constitutionally entitled to the treatment of his choice.

Plaintiff also alleges Dr. Stamps refused to treat his prostate cancer, but this is refuted by the record. The evidence shows Plaintiff was diagnosed with prostate cancer and had his prostate removed in 2007. (Findings of Fact ¶ 4.) He did not complete radiation treatment at the time but instead chose to monitor his PSA levels for any recurrence. (Id.) In 2016, Plaintiff's PSA increased to 0.3, and Plaintiff completed radiation treatment before his incarceration. (Id. ¶ 11.) After his incarceration, Dr. Stamps had Plaintiff's PSA levels regularly tested and monitored for any incidence of cancer recurrence. (Id. ¶ 20.) Plaintiff's PSA has been < 0.01 and < 0.02 under Dr. Stamps' supervision. (Id. ¶¶ 20, 25, 32, 37, 39.) Dr. Stamps states in her Declaration that with these PSA levels, Plaintiff only requires continued monitoring. (Id. ¶ 40.) Plaintiff's PSA level is not a concern unless it reaches 0.4. (Id.) Plaintiff claims he was denied treatment for prostate cancer, but no treatment has been needed other than monitoring.

Finally, Plaintiff alleges he suffers pain in his urinary tract and that Dr. Stamps has not provided treatment to alleviate this, but his medical records do not offer support for the claim. Plaintiff's medical records reflect complaints of pain with respect to his teeth, his feet and toenails, and his wrist, and in each instance Plaintiff was provided with pain medication. Plaintiff's medical records do not appear to reflect complaints of pain as to his urinary tract, although there are many notations where Plaintiff requested and received Depends or oral medications, and his prostate and urinary leakage conditions were discussed and addressed.

The record establishes that Dr. Stamps was not deliberately indifferent to Plaintiff's incontinence or history of prostate cancer, as it demonstrates she did not ignore Plaintiff's complaints or his overall condition. Plaintiff's medical records show Dr. Stamps and other MDOC healthcare staff tried numerous treatments and medications and consistently responded to

Plaintiff's complaints. At times, Plaintiff reported to his health care providers that various treatments were providing some relief. Plaintiff's Complaint asserts claims that indicate his disagreement with his course of treatment, which does not rise to the level of a constitutional violation. Viewing the evidence in the light most favorable to Plaintiff, the treatments provided were not so ineffective as to be criminally reckless and therefore are not deliberately indifferent.

**Conclusion**

For the reasons discussed above, the Court finds that although Plaintiff has a serious medical condition, he fails to put forward evidence to support a finding of deliberate indifference by Dr. Stamps. Defendant has established there are no genuine issues of material fact in dispute and she is entitled to summary judgment on Plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Dr. Ruanne Stamps' Motion for Summary Judgment is **GRANTED**. (ECF No. 17)

A separate Judgment will accompany this Memorandum and Order.

Ronnie L. White

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 4th day of November, 2020.

17